Filed 5/4/26  P. v. Anderson CA3

<u>NOT TO BE PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

| | |
|---|---|
| THE PEOPLE,<br>    Plaintiff and Respondent,<br><br>v.<br><br>ROBERT ANTHONY ANDERSON,<br>    Defendant and Appellant. | C101712<br><br>(Super. Ct. No. 19CF05564) |

On the morning of August 27, 2019, in Forest Ranch, Butte County, defendant Robert Anthony Anderson beat Gunther Klaus Rupprecht (the decedent) to death.  A jury found defendant not guilty of first degree murder but found him guilty of the lesser included offense of second degree murder, and also found him guilty of two drug-related offenses.  The trial court sentenced defendant to 15 years to life for murder and an additional five years determinate on the drug-related convictions.  Defendant argues on appeal that the trial court prejudicially erred in failing to instruct the jury, on its own motion, (1) with CALCRIM No. 3425 on unconsciousness, that unconsciousness may be caused by a blackout, and that he was not guilty of murder if he acted while unconscious, and (2) with CALCRIM No. 626 that he was not guilty of murder, and was only guilty of involuntary manslaughter, if he killed while unconscious due to voluntary intoxication. We will affirm the judgment.

1

# BACKGROUND

An information charged defendant with murder (Pen. Code, § 187, subd. (a); count 1),[1] possession for sale of a controlled substance (Health & Saf. Code, § 11351; count 2), and sale, transportation, or offer to sell a controlled substance (Health & Saf. Code, § 11352, subd. (a); count 3).

## Trial—The Prosecution Case

### Events Prior to the Killing—August 26-27, 2019

On August 26, 2019, at 7:00 or 8:00 p.m., Brandon H.[2] hosted several friends at his house in Chico, including the decedent, defendant, E. F., and Rebecca M. They were all drinking and doing cocaine, which was supplied by defendant. E.F. testified that defendant was agitated, angry, and out of control throughout the evening, which made her uncomfortable. She testified that he was "not himself" and that something was different. Defendant told E.F. he had been up for some time, which E.F. assumed was because of the cocaine, although defendant did not tell her that.

At some point, the group ran out of cocaine, so Brandon and defendant left so defendant could acquire more. E.F. and Rebecca also left because they felt scared and uncomfortable, and thus they were not there when Brandon and defendant returned. Upon returning, defendant had a bright yellow box which contained cocaine and money. Defendant, the decedent, and Brandon continued to do cocaine and drink.

At approximately 5:00 a.m., defendant and the decedent left Brandon's house. According to Brandon, they intended to go to the decedent's house in Forest Ranch to continue drinking.

---

[1] Further undesignated section references are to the Penal Code.

[2] To protect privacy, we will refer to some individuals by their first name and last initials or by first and last initials and, thereafter, by their first names or initials. (Cal. Rules of Court, rule 8.90(b)(10).)

*Defendant After the Homicide—August 27, 2019*

S.A. and her son, W.A., lived on the same road in Forest Ranch as the decedent. On August 27, 2019, at perhaps 10:00 a.m. or noon, defendant approached their house, barefoot, with his hands up, saying he needed help. He said he had no weapons, and that he had been attacked. "He was bleeding from his foot. And he had marks on him. And...his eyes were dilated." He had blood on him. Defendant said that " 'they were trying to kill him,' " and that " 'he wasn't going to let no 18-year-old kid kill him.' " Defendant claimed he was " 'fighting for his life,' " and said someone had tried to rob him. Referring to the other man, defendant said, " 'he wasn't breathing. And he was pretty sure that he was dead.' " He told W.A. that once he started swinging, he could not stop, and he did not know " 'if the guy was breathing.' "

Blood was squirting from defendant's foot, so S.A. retrieved bandages. W.A. hosed defendant off. Defendant said he thought he had been stabbed, but S.A. did not observe any stab wounds. Defendant had "a lot of little nicks and stuff, but they weren't really noticeable…."

Defendant asked to be taken to his mother's home in Chico and offered to pay, but he had no money. S.A. decided they should call 911. Because there was no cell phone signal at the house, S.A. took defendant to a nearby market, where someone called the police.

CalFIRE firefighter Matthew Aldrich responded to the market in Forest Ranch. There, he saw defendant sitting against a wall. He had a one-inch laceration to his right foot and a cut on his left bicep, but no other apparent injuries. Defendant complained only of right foot pain. Defendant had the appearance of someone who was in shock.

When CalFIRE firefighter Aldrich asked what happened, defendant responded that "he went out to use his phone that…morning. And the other gentleman at that property had come out with a machete, acting crazy, and swiped his phone away with the

3

machete." Defendant then said that he had "punched the other gentleman in the face, knocking him to the ground. And then kicked him in the face over a hundred times…."

CalFIRE Captain James Derington testified that, when he saw defendant at the market, he was "pretty much covered head to toe" in dried blood.

*The Scene of the Homicide*

Sergeant Jason Miller of the Butte County Sheriff's Office arrived at the decedent's property in Forest Ranch and saw the decedent on the ground near the driveway. CalFIRE's Derington and Aldrich confirmed he was dead. Derington testified that there was blood "[a]ll over the place," and that the amount of dried blood he had seen on defendant was consistent with the injuries inflicted on the decedent.

On a picnic table outside the residence, there was a mirror with a line of a white powder substance on it, a $20 bill rolled up like a straw, alcohol, and a yellow box containing $1,100 in cash, cocaine, and plastic baggies consistent with drug paraphernalia.

There was a car parked at the residence, and there was blood on the car. Near the car, there was a PVC pipe covered in blood. Next to the car's wheel, there was a plastic snow shovel, broken on one side, which was covered in blood. The broken-off portion of the shovel was found some distance away. Law enforcement also found a large rock covered in blood and a kitchen knife covered in blood and dirt.

Jennifer Celentano, a coroner's investigator for the Butte County Sheriff's Office, testified as a certified medical death investigator. At the scene, Celentano saw "blood everywhere." The decedent was lying in the driveway, riddled with injuries and covered in dirt and blood. He had multiple sharp force injuries on his arm and hands, suggesting they were defensive wounds, that were consistent with being inflicted either by the sharp side of a snow shovel or a knife. The decedent also had a sharp force injury to his leg consistent with being struck by a snow shovel or a knife. He had sharp force injuries to the top of his head or forehead, consistent with being inflicted by a knife or shovel, and a

4

blunt force injury to the head, consistent with being inflicted by a pipe or a rock or with being stomped on. He had at least 20 sharp force injuries and approximately five blunt force injuries. Celentano concluded decedent had been beaten to death.

Inside the house, investigator Celentano observed blood everywhere. She observed shoe prints and footprints in blood. There was also a large pool of blood in the house. Outside, Celentano observed three paths leading from the house onto the driveway, with blood along all three. Celentano testified that the "decedent only had socks on. There was no blood on the bottom of his feet." The bloody footprints were significant because they indicated that someone "was running to and from the house through the pools of blood."

No machete was found at the crime scene.

*Autopsy*

Dr. Katherine Raven performed the autopsy on the decedent, who had multiple contusions, abrasions, and cuts to the head. He had at least eight large open wounds to the back of the head, most of which were sharp force injuries, but some of which were blunt force injuries. He had three large, open sharp force wounds on his forehead. He had a laceration and fracture of the nose. He had sharp and blunt injuries to both sides of his face and an impact injury to his mouth. He sustained a significant fracture to his skull near his right eyebrow.

The decedent sustained defensive injuries to his arms and hands. He had at least three such injuries to the right forearm, injuries to the left hand and wrist, and at least six sharp force injuries across the back of his hand. He also had large bruises on both shoulders. He also had approximately 16 superficial linear wounds on his body. He had abrasions on his knees and three sharp force injuries to his right leg. Dr. Raven determined that the cause of death was multiple blunt and sharp force injuries, and the mechanism of death was injuries to the decedent's head, severe skull fractures, and injury to his brain.

On August 27, 2019, defendant and the decedent went to the decedent's house in Forest Ranch. There, they hung out at the picnic table listening to music, drinking, smoking marijuana, and doing cocaine. The decedent was doing lines of cocaine while defendant was just doing "bumps," meaning that "[y]ou stick it into…a key and just do a little bit." Defendant did not like to do full lines of cocaine because he did not "like to get that high."

After a while, defendant stepped away to make a call. Suddenly, he heard a footstep, and then he was hit in the back of the head. He turned around and backpedaled. He saw the decedent coming at him with a shovel. Defendant assumed he had been hit with the shovel. He backpedaled at least 10 feet. He said, "Hey, what's up? What's going on? Let's talk about it." The decedent continued coming at defendant and attacked him with the shovel.

Asked what he did next, defendant testified that he could "only speculate because at that point I blacked out." He remembered the initial attack to the back of his head. He remembered seeing the decedent coming at him. And he remembered seeing the decedent swinging at him. Defendant thought, "this guy is going to kill me." He remembered backpedaling and saying, "let's talk about this." However, after that, the next thing defendant remembered was being on the property with blood spurting out of his foot. He was losing a lot of blood and "was pretty sure [he] was going to die." He tried to find keys to the decedent's car, but eventually left on foot.

Defendant hobbled down the driveway to the road. He continued down the road about a quarter of a mile until he came upon S.A.'s house. W.A. was in the driveway. Defendant put his hands up, said he was unarmed, and asked for help. S.A. and W.A. hosed defendant off to "figure out what was what."

Defendant testified that he "was pretty out of it that whole day" after the incident. He was "in and out of…consciousness." He testified, again, that, "after he's coming at

me with the shovel in hand, and he continued to hit me after I tried to get him to stop, I blacked out. And that whole day, looking back on it, I don't remember a lot of it."

During her cross-examination of defendant, the prosecutor played a video of defendant's interview with Detective Hugh Hooks. Defendant told Hooks that the decedent unexpectedly hit him with something multiple times. Hooks asked if defendant knew what the decedent hit him with, and defendant responded, "[a]t this point it's all a blur," and then said, "it was turning into mostly a blur." He then told Hooks that the decedent hit him six to 10 times. Defendant told Hooks, "I shocked his ass," and that he threw punches at the decedent, and maybe an elbow, and the decedent "went down." He stated that he weighed 110 pounds, and that he "was fightin' for my life." Hooks asked defendant how many times he hit the decedent, and defendant responded that he hit the decedent 10 to 20 times. Defendant then told Hooks that, after he got the decedent down, "I hit him a few times and he was–when he was down, that's for sure." Defendant then went through the decedent's pockets looking for keys. When he could not find keys, he left on foot. He also mentioned that his foot had been "sliced wide open" "with a glass."

Defendant testified at trial that he had no recollection of telling anyone that he cut his foot on glass or that he had been attacked by someone wielding a machete. Defendant reiterated that "that whole day is pretty much a blur to me." Defendant again testified that, after the altercation began, he "blacked out." He had no recollection of telling Detective Hooks that he threw punches and an elbow. Asked if he told Hooks that he punched the decedent 10 to 20 times, defendant eventually acknowledged that statement. Asked if he hit the decedent a few times when he was down, defendant acknowledged telling Hooks that he had.

The prosecution played a second clip from the interview. Detective Hooks asked defendant why there had been mention of a machete, and defendant responded that he believed he had been hit in the foot with a machete. He also said he may have kicked the decedent once or twice. He did not remember saying he had kicked the decedent around

100 times. In his trial testimony, defendant acknowledged that he told law enforcement his foot was cut with a machete.

The prosecution played a recording of another interview between Detective Hooks and defendant. In that interview, defendant stated that the decedent struck him with a shovel. According to defendant, the decedent hit him a few times, including on his head, his arm, and, he supposed, his foot. Defendant stated that the decedent "kept trying to hit me." Defendant "was scared. I was scared for my life. So what do I do? I fight…." The decedent hit him "at least three times" that he could recall. He continued, "[a]fter that…I black–I blanked out." Hooks asked defendant how he fought back, and defendant responded, "[t]hat's the thing, once I started fighting, I was–I went and blacked out." He stated that he still did not remember the fight. It was a "complete blur." Hooks asked defendant the next thing he remembered after blacking out. Defendant replied that he "start[ed] having memory" when he was walking down the driveway, and his foot was squirting blood. Defendant also told Hooks that, "I believe I was hit with a shovel, the more and more I think about it. Then that'll–that was screwin' my head up bad, too."

Defendant testified that he had been fully blacked out and he did not remember how the decedent was killed. When asked about the fact that, the day before his testimony, he told a friend on a phone call from jail that he had killed the decedent with a shovel, defendant responded, "Yeah, that's not a puzzle," and, "it's pretty clear I killed him with a shovel."

*Stipulations*

Defendant's blood was drawn on August 28, 2019, and his blood alcohol content was 0.06 percent. He tested positive for benzoylecgonine and cocaine. The cocaine was below the 0.01 mg/L level of quantification. He had 0.03 mg/L of Lidocaine. He also tested positive for marijuana. At the time of his death, the decedent's blood alcohol content was 0.15 percent. He had 0.22 mg/L of cocaine, 1.14 mg/L of benzoylecgonine, and he tested positive for marijuana. The substance in the yellow box found on the picnic

table tested positive for cocaine and weighed 47.67 grams. All blood at the crime scene belonged to either defendant or the decedent.

*Verdicts and Sentencing*

The jury found defendant not guilty of first degree murder, but found him guilty of the lesser included offense of second degree murder. The jury also found defendant guilty of possession for sale of a controlled substance, and sale, transportation, or offer to sell a controlled substance. The trial court sentenced defendant to an aggregate term of 20 years to life in state prison, consisting of an indeterminate term of 15 years to life for murder, the determinate middle term of four years for sale, transportation, or offer to sell a controlled substance, and one year determinate, one-third the middle term, for possession for sale of a controlled substance.

DISCUSSION

I

*CALCRIM No. 3425*

Defendant argues the trial court erred in failing to instruct the jury, on its own motion, with CALCRIM No. 3425 on unconsciousness, that unconsciousness may be caused by a blackout, and that he was not guilty of murder if he acted while unconscious. Defendant emphasizes his extrajudicial statements and his trial testimony that he blacked out after the decedent hit him in the head with a shovel and continued to attack him. We conclude the trial court did not err in not instructing the jury on its own motion with CALCRIM No. 3425.

"Among those persons deemed incapable of committing a crime are individuals who 'committed the act charged without being conscious thereof.' " (*People v. Rogers* (2006) 39 Cal.4th 826, 887 (*Rogers*), quoting § 26, class four.) " 'Unconsciousness does not mean that the actor lies still and unresponsive. Instead, a person is deemed "unconscious" if he or she committed the act without being conscious thereof.' " (*Rogers,* at p. 887.) As defendant correctly notes, CALCRIM No. 3425 specifies that

9

unconsciousness may be caused by, among other things, a blackout. "Unconsciousness, when not voluntarily induced, is a complete defense to a charged crime." (*Rogers,* at p. 887.)

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence." ' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154, disapproved on another ground in *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7.) "A trial court must instruct on unconsciousness on its own motion if it appears the defendant is relying on the defense, or if there is substantial evidence supporting the defense and the defense is not inconsistent with the defendant's theory of the case." (*Rogers, supra*, 39 Cal.4th at p. 887.) Substantial evidence is "evidence sufficient for a reasonable jury to find in favor of the defendant…." (*People v. Salas* (2006) 37 Cal.4th 967, 982.) "In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt…." (*Ibid*.) "If the defense presents substantial evidence of unconsciousness, the trial court errs in refusing to instruct on its effect as a complete defense." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 417.) An appellate court reviews a trial court's failure to instruct on a defense theory de novo, and, in doing so, views the evidence in the light most favorable to the defendant. (*People v. Ibarra* (2024) 106 Cal.App.5th 1070, 1081.)

Defendant in the trial court did not expressly rely on a defense of unconsciousness. In his opening statement, defense counsel stated that this "is going to be a case about self-defense." He stated that the jury would hear testimony that the decedent attacked defendant, and defendant "defend[ed] himself and unfortunately kill[ed]" the decedent. In closing, defense counsel stated that defendant "is not a murderer. He acted in self defense." Defense counsel did note that defendant testified that "he doesn't recall all the facts and circumstances of what happened…." Counsel argued that it was "not

10

unreasonable for [defendant] not to recall something….” He noted that defendant had testified that, after the decedent’s “initial attack he blacked out. He can’t recall what happened. He told that to law enforcement too on multiple times. He told law enforcement that he was scared. But he can’t recall the immediate actions right after [the decedent’s] attack.” In concluding, defense counsel stated that the “[p]rosecution failed to prove that [defendant] acted with the intent to kill, with the malice aforethought, that he planned to kill, this happened to kill. [*sic*] None of that’s there. This was heat of passion. This was self defense. [Defendant] believed he was acting to protect himself.” Defense counsel did not refer to unconsciousness or argue that defendant committed any act while unconscious. Thus, while defense counsel did note that defendant could not recall events and that he blacked out, contrary to defendant’s contention, he did not rely on unconsciousness as a defense. Therefore, we turn to whether there is substantial evidence supporting that defense. (See *Rogers, supra*, 39 Cal.4th at p. 887.)

Defendant testified that, as the decedent advanced on him after hitting him with what he assumed to be the shovel the decedent was holding, he could only speculate what happened next because he blacked out. He testified that, after backpedaling and saying, “let’s talk about this,” he blacked out, and the next thing he remembered was being on the property with blood spurting out of his foot. Defendant testified that he “was pretty out of it that whole day” after the incident, and that he was “in and out of…consciousness.” He testified that, “that whole day, looking back on it, I don’t remember a lot of it.” He later reiterated that “that whole day is pretty much a blur to me.” He again testified that, after the altercation began, he “blacked out.” Defendant also testified that he had been fully blacked out and he did not remember how the decedent was killed.

In his initial interview, Detective Hooks asked if defendant knew what the decedent hit him with, and defendant responded, “[a]t this point it’s all a blur,” and “it was turning into mostly a blur.” In a subsequent interview, defendant stated that, after the decedent hit him at least three times, he “black–I blanked out.” After making a

11

representation that he fought back, and after Hooks asked him how he fought back, defendant stated, "[t]hat's the thing, once I started fighting…I went and blacked out." He stated that he did not remember the fight, and that it was a "complete blur." Defendant said more than once that the first thing he remembered after blacking out was coming to on the property with blood squirting out of his foot. Thus, in extrajudicial statements and in his trial testimony, defendant reported that he blacked out and could not recall killing the decedent.

But defendant *also*, and *repeatedly*, described the altercation and detailed his assault on the decedent. In his first interaction with others after killing the decedent, defendant told S.A. and W.A. that he had been "fighting for his life." He told W.A. that once he started swinging, he could not stop, and he did not know "if the guy was breathing." Defendant told S.A. that he thought he had been stabbed, although S.A. did not see any stab wounds. That defendant thought he might have been stabbed suggests that he recalled aspects of the altercation.

At the market in Forest Ranch, defendant told CalFIRE firefighter Aldrich that he had "punched the other gentleman in the face, knocking him to the ground. And then kicked him in the face over a hundred times…." And in his first interview with Detective Hooks, defendant recalled that the decedent hit him with something six to ten times. Defendant then told Hooks, "I shocked his ass," and that he threw punches at the decedent, and maybe an elbow. He specified that he did not have any weapons. Defendant remarked that he weighed 110 pounds, and stated that he "was fightin' for my life." The decedent "went down." Hooks asked defendant how many times he hit the decedent, and defendant responded that he hit the decedent 10 to 20 times. Defendant then told Hooks that, after he got the decedent down, "I hit him a few times and he was– when he was down, that's for sure." Defendant then told Hooks that, after decedent went down, defendant "was so scared that he was gonna get back up and I didn't know what

12

was gonna happen." Defendant went through the decedent's pockets looking for keys, but could not find them and eventually left on foot.

In a later interview with Detective Hooks, defendant stated that the decedent "kept trying to hit" him and he "was scared. I was scared for my life. So what do I do? I fight...." Defendant at trial acknowledged that he told Hooks that he punched the decedent 10 to 20 times. He also acknowledged that he told Hooks that he hit the decedent after the decedent went down. And in a jail call the day before his trial testimony, defendant told someone that he killed the decedent with a shovel.

Defendant's extrajudicial statements and his trial testimony, that he blacked out and did not recall beating the decedent to death, are belied by the foregoing statements offering details of the beating and his flight. The only support for defendant's argument is his own statements representing that he blacked out and could not recall killing the decedent. However, a "[d]efendant's professed inability to recall the event, without more, [i]s insufficient to warrant an unconsciousness instruction." (*Rogers, supra*, 39 Cal.4th at p. 888; see *ibid*. ["there is no 'ineluctable rule' that a defendant's inability to remember supplies an evidentiary foundation for an unconsciousness instruction"], quoting parenthetically *People v. Heffington* (1973) 32 Cal.App.3d 1, 10.) We note that S.A. testified that defendant's eyes were dilated, and CalFIRE firefighter Aldrich testified defendant had the appearance of someone in shock. However, there could be several explanations for these conditions and defendant does not cite them as evidence of unconsciousness. Moreover, there was no evidence to support the premise that an individual who has blacked out or lost consciousness would have such symptoms. This testimony thus does not support defendant's argument. We also note, as emphasized by the People, that there is no indication in the record that defendant sustained or complained of a head injury. There is nothing to support defendant's argument other than his professed inability to recall killing the decedent.

13

Defendant emphasizes that the Supreme Court in *Rogers* observed: "nor did defendant himself testify he was unconscious, but only that he could not later recall the killings." (*Rogers, supra*, 39 Cal.4th at p. 887.) Defendant therefore seeks to distinguish this case from *Rogers* because here, defendant not only stated that he did not *recall* the killing, but also that he *blacked out*, which, defendant states, "is synonymous with unconsciousness under the law." We conclude, however, that defendant's mere invocation of the phrase "blacked out" does not establish an entitlement to an instruction on unconsciousness, particularly where he has also described numerous details of the beating he inflicted on the decedent, causing his death.

Defendant relies on *People v. Wilson* (1967) 66 Cal.2d 749 for the proposition that a trial court errs in failing to instruct on unconsciousness even where "the only evidence of unconsciousness came from the defendant." (*Id*. at p. 762.) However, unlike the circumstances here, the defendant in *Wilson*, while claiming that he could not recall shooting the two murder victims, did not offer detailed descriptions of the actions he took while purportedly unconscious that contradicted his claimed inability to recall events.

We find unpersuasive defendant's argument that the jury reasonably could have viewed his numerous statements in which he described his assault of the decedent, such as that he was fighting for his life and that he repeatedly punched and kicked the decedent, "as a candid acknowledgment...that he realized before he left the scene…that he *must have* fiercely resisted [the decedent's] attack in some manner because he could see that [the decedent] 'wasn't breathing' and he was 'pretty sure that he was dead,' …" In his statements, defendant did not describe observing the decedent's body and, based on its condition, deducing what he must have done while unconscious. Rather, he described in detail, among other things, "fighting for his life," punching the decedent in the face, knocking him to the ground, kicking him in the face over 100 times, throwing punches and maybe an elbow, and hitting the decedent 10 to 20 times, including while he was down. We do not credit defendant's argument that these statements were merely

14

"evidence that [defendant] realized afterward that he had used some form of deadly force against" the decedent.

Defendant alternatively argues that, "even if [his] statements about punching and kicking [the decedent] could reasonably be viewed as conflicting with his statements that he blacked out, he was still entitled to the unconsciousness instruction." He relies on *People v. Gana* (2015) 236 Cal.App.4th 598 for the premise that conflicting evidence as to whether a defendant was unconscious does not negate the requirement that the court instruct on the unconsciousness defense. In *Gana*, the defendant gave a detailed account shortly after the shootings, but, at trial, she claimed to have a limited recollection of it. (*Id*. at p. 609.) The appellate court stated: " '[t]hat [s]he did not, by the time of trial, accurately recall certain details of the shootings does not support an inference [s]he was unconscious when [s]he committed them.' " (*Ibid*.) However, the *Gana* court continued: "[b]ut here there was other evidence that justified giving unconsciousness instructions. Tony Gana testified defendant's eyes were wide open and her face lacked emotion when she shot his father. A deputy sheriff also described her as having 'a thousand mile stare' and paramedics said she remained silent when asked a series of standard questions." (*Ibid*.) Additionally, "[t]he defense presented the testimony of medical experts who identified the medications [the] defendant was taking to combat cancer and to overcome the adverse effects of the chemotherapy, and explained how these medications could affect her mental state." (*Id*. at pp. 609-610.) Based on the conflict in the evidence, the court concluded that the evidence supported instructions on unconsciousness. (*Id*. at p. 610.)

Here, conversely, the only evidence relevant to unconsciousness is the defendant's bare claims that he blacked out and cannot remember. However, as stated, these claims are belied by his detailed statements describing his assault and flight. Unlike *Gana*, there was no other eyewitness testimony and no medical testimony to support defendant's claim of unconsciousness. While defendant argues that there is no legal requirement

15

"that the defense present expert testimony to explain the cause of the blackout, or that eyewitness testimony corroborate the defendant's account of his blackout,"; the fact remains that a "[d]efendant's professed inability to recall the event, without more, [i]s insufficient to warrant an unconsciousness instruction." (*Rogers, supra*, 39 Cal.4th at p. 888.)

We conclude that substantial evidence did not support the unconsciousness defense and CALCRIM No. 3425. The trial court did not err by not instructing the jury with CALCRIM No. 3425 on its own motion.

II

*CALCRIM No. 626*

Defendant also argues that the trial court erred in failing to instruct the jury, on its own motion, with CALCRIM No. 626 and the lesser included offense of involuntary manslaughter. CALCRIM No. 626 would have informed the jury, in part: "When a person voluntarily causes his or her own intoxication to the point of unconsciousness, the person assumes the risk that while unconscious he or she will commit acts inherently dangerous to human life. If someone dies as a result of the actions of a person who was unconscious due to voluntary intoxication, then the killing is involuntary manslaughter." (CALCRIM No. 626.) Defendant argues that substantial evidence supported this instruction, specifically evidence of his use of cocaine to the point of voluntary intoxication and unconsciousness in the hours preceding the homicide. We disagree.

"Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (§ 29.4, subd. (b).) " 'Voluntary intoxication can prevent formation of any specific intent requisite to the offense at issue, but it can never excuse homicide.' [Citation.] Hence…, voluntary intoxication could reduce a criminal homicide to involuntary manslaughter only if the defendant was rendered unconscious: 'When a

16

person renders himself or herself unconscious through voluntary intoxication and kills in that state, the killing is attributed to his or her negligence in self-intoxicating to that point, and is treated as involuntary manslaughter.' " (*People v. Rangel* (2016) 62 Cal.4th 1192, 1227.) A person may be unconscious in this context when the person acts but is not conscious of acting. (*People v. Heard* (2003) 31 Cal.4th 946, 981.)

Generally, involuntary manslaughter is treated as a lesser included offense to murder. (*People v. Ochoa* (1998) 19 Cal.4th 353, 422.) " ' "[I]t is the 'court's duty to instruct the jury not only on the crime with which the defendant is charged, but also on any lesser offense that is both included in the offense charged *and shown by the evidence to have been committed*.' [Citation.]" [Citations.]' [Citation.] … ' "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense…." [Citation.] Rather, substantial evidence must exist to allow a reasonable jury to find that the defendant is guilty of a lesser but not the greater offense. [Citation.] " ' "Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." ' " ' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 718.) "A trial court must instruct the jury 'sua sponte on involuntary manslaughter based on unconsciousness' whenever 'there is evidence deserving of consideration that the defendant was unconscious due to voluntary intoxication.' " (*People v. Turk* (2008) 164 Cal.App.4th 1361, 1371, fn. omitted.) A trial court's failure to instruct on a lesser included offense is reviewed de novo (*People v. Nieves* (2021) 11 Cal.5th 404, 463), and we consider the evidence in the light most favorable to the defendant (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137).

Here, there was substantial evidence that defendant used cocaine. However, we conclude there was not substantial evidence that defendant's cocaine use rendered him voluntarily intoxicated to the point of unconsciousness, preventing him from forming the intent to kill.

17

In the hours preceding the homicide, defendant and his four companions were drinking and using cocaine. When the cocaine ran out, Brandon and defendant went to get more. Upon their return, defendant, the decedent, and Brandon continued to drink and use cocaine. At around 5:00 a.m., defendant and the decedent left to go to the decedent's house in Forest Ranch to continue drinking. There, defendant and the decedent hung out drinking, smoking marijuana, and doing cocaine. The decedent was doing lines of cocaine while defendant was just doing "bumps," meaning that "[y]ou stick it into...a key and just do a little bit." Defendant did not like to do full lines of cocaine because he did not "like to get that high." Defendant "lost track of time." After a while, he stepped away to make a call, the decedent hit him on the back of his head, and defendant blacked out. Later, at the scene of the homicide, law enforcement would find a mirror with a line of white powder substance on it, a $20 bill rolled up like a straw, and a yellow box containing 47.67 grams of cocaine. In his initial interview with Detective Hooks, Hooks asked about drugs, and defendant responded, "No, I didn't." When defendant's blood was drawn on August 28, 2019, his blood alcohol content was 0.06 percent, he tested positive for benzoylecgonine and cocaine, the cocaine was below the 0.01 mg/L level of quantification, he had 0.03 mg/L of Lidocaine, and he tested positive for marijuana.

Thus, the jury heard evidence that defendant used cocaine. The jury also heard evidence in the form of defendant's testimony and extrajudicial statements that he had blacked out. However, we find no evidence in the trial record, let alone substantial evidence, to establish, or even suggest, that when he killed the decedent, defendant was voluntarily intoxicated to the point of unconsciousness as a result of using cocaine.

Defendant argues that he was "using and sharing *so much cocaine* that he ran out and had to go pick up more, so he could continue using and sharing it." However, despite defendant's framing, the record sheds no light on how much cocaine defendant himself used. In fact, the record establishes that, later, while the decedent inhaled lines of

18

cocaine, defendant only did "bumps" because, in his own words, he did not "like to get that high." And defendant in his interview with Detective Hooks represented that he did not do drugs. This is not substantial evidence that defendant's cocaine use rendered him voluntarily intoxicated and unconscious.

Defendant emphasizes E.F.'s testimony that he was agitated, angry, out of control, and did not seem to be "himself." Defendant told E.F. he had been up for some time, which E.F. assumed was because of the cocaine, although defendant did not tell her that. This, too, is not substantial evidence that defendant's cocaine use rendered him voluntarily intoxicated and unconscious.

Defendant refers to his "prodigious consumption of cocaine," and the "copious amount of cocaine he ingested…." But, again, the record does not contain substantial evidence, or any evidence, of the extent of defendant's personal cocaine use to support these characterizations. Nor does the record contain substantial evidence that defendant's cocaine use rendered him voluntarily intoxicated and unconscious. We also note that there was no medical testimony concerning the effects of cocaine on defendant and no detailed testimony concerning how his cocaine use affected him.

Moreover, as discussed above, the record lacks substantial evidence that defendant was unconscious when he beat the decedent to death. Defendant remembered in detail the events leading up to, during, and after the confrontation. He remembered partying with his friends. He remembered going to the decedent's house. He remembered hanging around at the picnic table, drinking, using cocaine, and listening to music. He remembered going to speak with someone on the phone, at which time, he stated, he was struck in the head, causing him to black out. According to defendant, his next recollection after blacking out was when he came to and realized that there was blood spurting from his foot. He was still on the decedent's property.

However, notwithstanding his representations that he blacked out and could not recall his fatal assault on the decedent, as discussed at length above, in his statements to

19

S.A. and W.A., to CalFIRE firefighter Aldrich, and to Detective Hooks, defendant described details of that assault. And, as stated, a defendant's "professed inability to recall the event, without more, [i]s insufficient to warrant an unconsciousness instruction." (*Rogers, supra*, 39 Cal.4th at p. 888; see *ibid*.) That defendant volunteered that he blacked out and could not remember assaulting the decedent alone is not substantial evidence of unconsciousness.

Having considered the entire record in a light most favorable to defendant (see *People v. Millbrook, supra*, 222 Cal.App.4th at p. 1137), we conclude there is not substantial evidence that, when he beat the decedent to death, defendant was voluntarily intoxicated and unconscious as a result of his cocaine use. Accordingly, the trial court did not err in failing to instruct the jury with CALCRIM No. 626 on its own motion.

DISPOSITION

The judgment is affirmed.


\s\
_____
KRAUSE, J.


We concur:



\s\
_____
MAURO, Acting P. J.



\s\
_____
FEINBERG, J.


20